Sean Morris
WORDEN THANE P.C.
321 West Broadway St., Suite 300
Missoula, Montana 59802
Telephone: (406) 721-3400
Facsimile: (406) 721-6985
Email: smorris@wordenthane.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| MAGLEBY CONSTRUCTION SUN VALLEY, LLC, | Civil No.: _____ |
| Plaintiff, | |
| v. | |
| SP HOTEL OWNER LLC; LONE MOUNTAIN LAND COMPANY LLC; HART HOWERTON PLANNING, ARCHITECTURE & LANDSCAPE ARCHITECTURE, P.C.; THE FIDELITY AND DEPOSIT COMPANY OF MARYLAND; FEDERAL INSURANCE COMPANY; LIBERTY MUTUAL INSURANCE COMPANY; and DOES 1-50, | **COMPLAINT** |
| Defendants. | |

Plaintiff Magleby Construction Sun Valley, LLC (hereinafter "Plaintiff" or

"Magleby"), by and through counsel, hereby complains against Defendants SP Hotel

Owner LLC, Lone Mountain Land Company LLC, Hart Howerton Planning, Architecture & Landscape Architecture, P.C., The Fidelity and Deposit Company of Maryland, Federal Insurance Company, Liberty Mutual Insurance Company, and Does 1-50 (collectively "Defendants") and for cause of action alleges as follows:

## PARTIES

1.    Magleby is an Idaho limited liability company with a principal place of business in Lindon, Utah.

2.    Defendant SP Hotel Owner LLC ("SPHO") is a Delaware limited liability company with a principal place of business in Boston, Massachusetts that owns real property in Gallatin County, Montana and operates the Montage Big Sky thereon.

3.    Defendant Lone Mountain Land Company LLC ("Lone Mountain") is a Delaware limited liability company with a principal place of business in Boston, Massachusetts.

4.    SPHO and Lone Mountain are collectively referred to herein as "Owner" or "Owners".

5.    Hart Howerton Planning, Architecture & Landscape Architecture, P.C. ("Hart Howerton" or "Architect") is a New York professional corporation with a principal place of business in New York City, New York.

6.    The Fidelity and Deposit Company of Maryland ("FDCM") is a

2

Maryland corporation with a principal place of business in Ownings Mills, Maryland.

7.    Federal Insurance Company ("FIC") is an Indiana Corporation with a principal place of business in Indianapolis, Indiana.

8.    Liberty Mutual Insurance Company ("Liberty Mutual") is a Massachusetts corporation with a principal place of business in Boston, Massachusetts.

9.     FDCM, FIC, and Liberty Mutual are collectively referred to herein as "Sureties."

10.    Does 1-50 ("Design Does") whose identities are unknown at this time, are believed to be design professionals hired by, or who performed work by, through or under, one or more of the Defendants on the construction project that is the subject of this lawsuit.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

12.    Venue is proper in the Butte Division of the District Court of Montana pursuant to 28 U.S.C. § 1391(b)(2) and Local Rule 1.2(c)(2) because a substantial part of the events or omission giving rise to the claim occurred in Montana and the

property that is the subject of the action is located in Montana.

## GENERAL ALLEGATIONS

13.    Magleby incorporates the preceding paragraphs as if fully set forth herein.

### Spanish Peaks Mountain Club

14.    SPHO was created for the purpose of owning, contracting for the improvement of, and running business operations on real property in Gallatin County, Montana.

15.    Lone Mountain purports to have been formed "to manage the planning, entitlement, building, marketing, and sale of premier real estate communities in and around Big Sky, Montana," including as an agent of SPHO.

16.    In or around 2013, SPHO purchased real property in Big Sky, Montana known as the Spanish Peaks Mountain Club (the "Property").

### The Project and Prime Contract

17.    On or about September 14, 2018, SPHO, through Lone Mountain, entered into a contract (the "Prime Contract") with Suffolk Construction Company, Inc. ("Suffolk") wherein Suffolk agreed to act as the general contractor for the construction of a 150-room luxury resort on the Property (the "Project").

18.    Hart Howerton is named as the Project architect in the Prime Contract.

19.    Upon information and belief, Owner directly hired a number of other

Design Doe design professionals to work on the Project.

20.     Under the terms of the Prime Contract, Owner took full and sole control over the design of the Project including oversight of Architect. *See* A133 §§ 3.2, 3.3, A201 §§ 1.1.2, 1.2.2.

21.     Owner agreed to "furnish information or services required of the Owner by the Contract Documents with reasonable promptness. The Owner shall also furnish any other information or services under the Owner's control and relevant to the Contractor's performance of the Work with reasonable promptness after receiving Contractor's written request for such information." *See* A201 § 2.3.5.

22.     At the outset of the Project, Owner made a decision to commence construction work on the Project without: (1) requiring Architect or the Project engineer of record (EOR) to fully coordinate the Project's architectural and structural drawings ("Construction Drawings"); and (2) ordering a constructability review of the Project.

23.     On or about April 2, 2021—after almost two years of work was underway and significant problems had arisen on the Project—a representative of Owner verbally acknowledged to Magleby that Owner understood, based on prior experience, that the Construction Drawings were "half-baked" and would result in downstream "casualties."

24.     During that same meeting, the Owner's representative informed

5

Magleby that Owner had acquired the Project from a previous developer, knew that there were substantial design deficiencies, and that changes to the Construction Drawings would be necessary but the Owner had opted to bypass coordination and instead prepared and disseminated fast-tracked Issued for Construction (IFC) drawings in early 2019.

25.    The Owner's representative further stated the Owner's "strategic decision" to move forward with inaccurate, unreliable, and uncoordinated drawings paid off from a financial perspective because the resulting delays allowed Owner to take advantage of more beneficial market timing and other economic and sales conditions.

*Subcontract*

26.    In early 2019, Owner approached Magleby about performing the exterior building scope work on the Project, to be contracted under Suffolk as the general contractor.

27.    The exterior building scope included the fabrication and installation of exterior timber wraps and timber solids, work that requires complete, accurate, and fully coordinated Construction Drawings.

28.    Magleby dispatched a pre-construction management team to Montana to evaluate and bid the Project based on its experience in both self-performing and contracting exterior work on multiple mountain projects in the Mountain West

region, including the installation of exterior timber wraps and solids.

29.    Magleby's team visited Big Sky multiple times to perform market research and evaluate available material vendors, general and specialty install crews, lodging, and other Project cost drivers.

30.    On siding, waterproofing, windows, doors, and other general construction materials, Magleby solicited pricing from multiple vendors, including vendors located in Sun Valley, Big Sky, and regional vendors including Franklin Building Supply, AC Houston, Millwood Direct, Simkin Hallins, Sapphire, and Pelican Bay.

31.    Based on its research, Magleby decided to utilize Simkin Hallins in Bozeman, Montana due to its proximity and logistical capabilities for pre-coat work and delivery to the Project site.

32.    On timbers, Magleby solicited pricing from local and regional fabricators and installers, including Pioneer Log (Montana), Ridgeline (Jackson Hole), and Pelican Bay (regional).

33.    Based on its research, Magleby decided to work with Pioneer Log due to its knowledge and history of the Project, having bid it several times with several competing contractors for the same scope of work.

34.    Magleby advised Owner and Suffolk that it could not self-perform this

7

Project and would subcontract the labor for the exterior scope of work.

35.    In so doing, Magleby relied on rates for subcontracted labor that fell well within the rates it had bid on similar projects in a mountain setting, while accounting for the high cost of the local lodging market, per diem, and wages in the Big Sky market.

36.    Magleby solicited install bids from contractors throughout the Intermountain West including View Point Windows & Doors (Idaho), Pinnacle Construction (Utah), Masterpiece Commercial Millwork (Utah), Golden Eagle Woodwork (Montana), Construct Builders (Utah), FRM Construction (Colorado), and Patriacca Construction (Colorado).

37.    As with its research on materials and labor, Magleby carefully and thoroughly reviewed the bid package provided by Suffolk based on the Construction Drawings. Magleby performed detailed quantity takeoffs of the entire scope of work using specialized industry software.

38.    Based on these takeoffs, Magleby prepared multiple estimates for the materials needed to complete its scope of work.

39.    Magleby remained in constant communication with its vendors and contractors (listed above) to provide the materials, resources, and labor to complete that work.

40.    Magleby conducted hundreds of meetings, phone calls, conferences,

plan reviews, and site visits with these companies during the bid process.

41.    Magleby also remained in constant communication with Suffolk's pre-construction team throughout the estimating process, working closely with Suffolk to evaluate the plans provide by the Owner and prepare plan takeoffs, bid numbers, quantities, and final numbers based on quantity, experience, labor wage rates, and production rates.

42.    Magleby's rates were consistent with its Project specific research, including comparisons to the actual production rates from historical projects it had performed on similar resorts in mountain terrain, and vendor and labor quotes for materials and labor.

43.    Suffolk also directed Magleby to harmonize its bid rates with Suffolk's own estimating numbers and bid direction.

44.    On or about February 13, 2019, Magleby Construction submitted its revised and final Construction Estimate for the Project based on Construction Drawings from the Architect dated August 24, 2017.

45.    All other competing bids submitted to Suffolk for the same scope of work and based on the same Owner provided plans were within less than two percent (2%) of Magleby's bid.

46.    The close proximity of all competing bids on this scope of work based on the Owner provided plans, and the fact that Magleby worked closely with Suffolk

as Suffolk directed it to lower its preliminary bid pricing based on the Owner provided plans, establishes the accuracy and reasonableness of Magleby's bid based on the contracting parties' understanding of the Construction Drawings and Contract Documents.

47.    Magleby Construction was the winning qualified bid and entered into a subcontract agreement with Suffolk on or about April 29, 2019 (the "Subcontract").

48.    In its bid preparation, Magleby relied on the well-established implied warranty that all construction drawings were prepared in the observance of commercial standards of good faith and fair dealing, including coordination and constructability of the Owner plans and drawings.

49.    As part of the Subcontract, Suffolk expressly agreed to "oversee the coordination process" and to "develop a design and coordination schedule that will align with the overall project construction schedule" with an "end goal of eliminating as many conflicts and clashes as possible and building reliable schedules that allow for efficient workflow and effective production control."

*Design Impacts*

50.    Magleby's experience on other projects of comparable complexity and size showed that drawing irregularities could be easily identified and worked out with the project architect and its design and construction team members within the

timeframe allotted for the project.

51.    In mid-2019, the Magleby timber fabrication and shop drawing technicians began to work through Architect's Construction Drawings and quickly learned that they were not coordinated for the Timber Wrap scope of work Magleby was hired to perform and showed serious and significant discrepancies with Magleby's contractual scope of work.

52.    Specifically, many more structural elements were required to be wrapped than what was detailed or noted in the Construction Drawings Magleby relied on to prepare its bid.

53.    This dramatically increased the time necessary to develop shop drawings due to the complexity of timber wraps.

54.    With each round of shop drawings proposed, there were many required revisions to the Construction Drawings, some of which were coordinated by the Architect, others of which were not coordinated by the Architect, and many of which were never coordinated through the duration of the Project.

55.    Magleby submitted proposed changes to Respondents with weeks or months passing before they were reviewed, changed, or approved.

56.    Magleby worked to mitigate these issues by coordinating the Construction Documents with the actual scope of work by: (1) hiring a third-party engineer to propose details and engineer connections and assemblies that were

needed in the construction but never provided to Magleby by the Architect or EOR; and (2) working through the second half of 2019 and the first half of 2020 to provide shop drawings and completing the exterior design that the Architect and EOR never completed.

57.    The shop drawing development had to be coordinated with Midwest Drywall, Magleby's predecessor trade framer, as the framing was often not as shown in the issued design documents.

58.    In many instances, Magleby observed that the structural drawings relied on by Midwest Drywall differed from Magleby's approved shop drawings causing confusion between trades.

59.    While Magleby was not responsible for the design work or the then unknown impacts of the Owner's inaccurate, incomplete, and uncoordinated plans between trades, it was forced to perform design work so the Project could get off the ground to Owner's benefit.

60.    To this date, the Construction Drawings have not been updated and still do not match the approved shop drawings.

*Fabrication Impacts*

61.    The Owner's decision to commence construction with inaccurate, unreliable, and uncoordinated Construction Drawings and the Architect's failure to timely work through issues Magleby identified had tremendous impact on the timing

of fabrication for required materials and the corresponding impact on schedules.

62.     Because of the Owner's problems with the Construction Drawings, fabrication on the Project was not ready to begin when initially scheduled.

63.     Consequently, Magleby's fabricator gave Magleby's fabrication window to a large government project in Northern Montana and pushed Magleby to a later fabrication window.

64.     This loss of position of the fabrication window forced Magleby to contract with multiple suppliers rather than just one, which required additional management, clerical support and additional shipping, handling, workload, and staging costs.

65.     Further, Magleby's new production window, necessitated by the inaccurate, unreliable, and uncoordinated Construction Drawings, coincided with the COVID-19 outbreak and other natural disasters and acts of God that led to plant shutdowns and longer procurement timelines which also impacted schedules.

*Installation Impacts*

66.     As a consequence of the unexpected increase to the number of timber wraps required on the Project, the installation timeline was extended as timber wraps take much longer to install than the solid timbers.

67.     The Construction Drawings also led to issues in the work of predecessor trades. Timber wrap construction followed after Midwest Drywall, who was

responsible to frame a plywood box around each steel member. Magleby would then follow behind Midwest Drywall and install the timber wrap to make the appearance look like a solid timber. Due to the inconsistency between the Construction Drawings relied upon by Magleby and Midwest Drywall, Magleby was forced to manage Midwest Drywall.

68.    Other trades were similarly impacted and the Project was plagued by overcrowded and out of sequence work conditions.

69.    In an effort to mitigate these delays, Magleby moved its crews around the Project, often performing work out of area and sequence to keep the Project moving, shouldering the costs of repeated demobilization and remobilization of crews.

70.    Magleby was forced to issue more than 150 site access and predecessor trade impact notices through the close of the Project.

71.    Magleby was also forced to bring additional management personnel on to manage predecessor trades and provide quality assurance and control (QA/QC) to other trades for months at a time.

72.    Site access continued to be a significant issue as delays caused by the Owner's uncoordinated plans and mismanagement extended the Project into a second, and unexpected, winter season.

73.    Ice and snow buildup on scaffolding, in stairwells and on elevated

hallways caused by the Owner's refusal to tent, heat and provide safe conditions at the Project created unsafe work conditions and prevented site access.

74.    During this second winter, scaffolding was left exposed with no tenting or heat protection to provide safe grip and safe working conditions for laborers.

75.    Magleby had to pay its installation crews to remove snow and ice buildup and buy shovels, heaters, and whatever other materials they needed to move snow and ice to create safe working conditions which further delayed the work.

76.    Due to the size and complexity of the Project and Magleby's focus and substantial effort on maintaining progress on the Project, it was impossible to assess and understand the impact and labor inefficiency costs resulting from the uncoordinated drawings and the Owner's failure to protect and provide safe access until late stages of the Project.

*Extended General Conditions*

77.    Due to the Owner's inaccurate, unreliable, and uncoordinated Construction Drawings and Suffolk's continuous failure to adequately supervise and manage the Project (either based on Owner's inaccurate, unreliable and uncoordinated drawings or its own management failures), and the resulting delays, Magleby incurred substantial and unforeseen extended general condition costs (i.e.

project specific overhead costs).

*Increased Labor Rates*

78.    It was only after Magleby's bid was submitted and accepted that Magleby learned much of what it bid as solid timber install labor actually required more costly and labor-intensive timber wraps.

79.    Magleby could not generate shop drawings from inaccurate, unreliable, and uncoordinated Construction Drawings and had to develop shop drawings with its own third-party engineer, creating its own details and assumptions of what predecessor trades would build.

80.    This impact to the base contract scope was unknown and could not have been priced at the time of bid or subsequent change orders.

81.    Due to the Owner's failure to coordinate the Project's Construction Drawings, changes to the drawings, increased scope of work, and a schedule extension through an unexpected second winter and beyond, timber installation costs on this Project far exceed historical rates and warrant additional compensation to Magleby.

82.    Solid timber installation costs also escalated due to inaccurate and uncoordinated plans and site access issues.

83.    The Construction Drawings did not identify many connections between

the structural steel and beams

84.     To remedy this issue, Suffolk directed Magleby to hire its own engineer to come up with these connections. This is work under the EOR's scope which is directly related to the Owner's failure to coordinate the Construction Drawings.

85.     Magleby was also repeatedly prevented from accessing the site to install low roof solid timbers based on predecessor trade issues, which upon information and belief were also caused the incomplete, unreliable and uncoordinated Construction Drawings.

86.     Lack of access substantially drove up costs as Magleby paid hourly rates to install crews to sit, demobilize, or remobilize to other available areas while predecessor trades completed or corrected defective work.

87.     Regarding Magleby's Roofline Fascia Labor, predecessor trade Swan Steel's installation was out of specification, upon information and belief due to the lack of coordinated Construction Drawings.

88.     Magleby crews were forced to perform additional furring to correct the out of tolerance steel to be within tolerance prior to installing the wood fascia trim.

89.     Magleby has documentation of the steel substrate being out of plane ½" to ¾" in 10-foot spans. C-Channels also did not align at joints with up to 1" in elevation differences as shown in Magleby's AWA #050.

90.     In almost every case, Magleby's install crews were forced to perform

out of scope work to prepare the substrate for fascia installation, including mag

drilling where the predecessor trade failed to do so. Magleby installation crews were

impacted by having to perform substrate corrections, shimming, planning new

layouts, and waiting for C-channels to get torqued.

91.    There are multiple locations on the Project where the C-Channel was a

different size or missing altogether from what was called out architecturally as

shown in Magleby RFI #062 and response to #1630.

92.    As work moved into a second and unexpected winter, the Owner's (or

its general contractor's) failure to provide snow removal, tenting, and heat forced

Magleby to pay its installation crews to remove snow, ice buildup, buy shovels,

heaters, and whatever they could to move snow and ice and create safe working

conditions. Scaffolding, stairways and elevated hallways were exposed to harsh

winter elements rather than being protected by heat to provide safe grip for laborers.

93.    Scaffolding, stairwells and elevated hallways were exposed rather than

being protected by tenting and heat for a safe working environment.

94.    Similarly, installation of weather barrier is sequential work that

contemplates starting in one location and working both directions around the Project.

95.    Predecessor trades Midwest Drywall and Montana Basement did not

complete their work in a timely or correct manner, upon information and belief due

to incomplete, unreliable and uncoordinated Construction Drawings.

96.    As a result, Magleby was constantly impacted and delayed from performing productive work because its predecessor trades delivered a jobsite with incomplete sheeting, gaps greater than 1", and waterproofing performed out of specifications relied upon by Magleby as shown in Magleby Impact/Delay Notice #05.

97.    Further, when installing weather barrier, the temperature must be above 0 degrees Fahrenheit.

98.    Installation also cannot occur if there is any condensation or moisture at all on the substrate.

99.    Owner's failure to provide proper tenting and heating limited site access and forced Magleby to send installation crews home or demobilize and mobilize to other areas where the sun had dried out the substrate.

100.    This impacted installation by forcing Magleby's crews—paid by the hour—to install the weather barrier out of sequence rather than in a straightforward and efficient manner.

101.    Installation of Wood and Hardi Siding and Soffit is sequential work that contemplates starting in one location and working both directions around the Project.

102.    The inaccurate, unreliable, and uncoordinated Construction Drawings

that Owner provided impacted this work.

103.    Siding had to be removed or re-sequenced at multiple locations due to hot tub railings, electrical boxes, and plumbing connections being incorrectly installed (or not installed at all) based on discrepancies in the Construction Drawings.

104.    Framing was not correct at locations of added deck drains, requiring the removal and reinstallation of soffit.

105.    Multiple soffits also had to be removed and reinstalled due to the incorrect installation of electrical boxes—the result of a lack of coordination between Construction Drawings and approved shop drawings as shown in CE #1479.

106.    As a result, Magleby was in a constant state of demobilization and remobilization, working out of sequence, and out of elevation, on a project covering nearly 500,000 square feet.

107.    Nearly every day, Magleby crews encountered missing and incorrect framing from Midwest Drywall. This includes framing in the wrong locations, framing to the wrong sizes, and no framing where framing was required based on the Construction Drawings relied upon by Magleby.

108.    These site issues impacted Magleby by causing crew movement from location to location, demobilization and remobilization, and paying crews to wait

for framing to be corrected before commencing or continuing work.

*Material Cost Increases*

109.  Owner's failure to supply accurate, reliable, and coordinated Construction Drawings, significantly increased the time Magleby was forced to spend preparing shop drawings. The Construction Drawings did not identify many connections between the structural steel and the beams and Suffolk directed Magleby to hire its own engineer to come up with these connections.

110.  As a result of this extended schedule, Magleby lost its fabrication window.

111.  The fabrication window Magleby was forced to accept pushed procurement into material price escalations related to massive wildfires and COVID-19, which limited both material supply and plant production.

112.  If Defendants had provided accurate, reliable, and coordinated Construction Drawings in compliance with their contractual obligations, Magleby would not have incurred these increased material prices.

*Additional Overruns*

113.  Magleby continues to analyze overruns in other cost codes resulting from Owner's failure to supply coordinated Construction Drawings, including, but

not limited to:

    a.  Balcony Cap Metal Decorative Flashing;

    b.  Exterior Framing System Labor;

    c.  Exterior Trim and Door/Window Labor; and

    d.  Metal Flashing.

**FIRST CAUSE OF ACTION**
**(Negligence – Owner)**

114.  Magleby incorporates the preceding paragraphs as though set forth fully herein.

115.  Owner maintained control over the design of the Project and was responsible for the oversight of Architect and other design professionals on the Project.

116.  Owner had a duty to ensure that the Construction Drawings on the Project were reliable, accurate, and coordinated.

117.  Owner breached its duty in commencing construction work on the Project with inaccurate, unreliable, and uncoordinated Construction Drawings.

118.  Owner knew or should have foreseen that Magleby and other subcontractors on the Project would rely on the inaccurate, unreliable, and uncoordinated Construction Drawings in submitting bids and entering into

subcontracts on the Project and were at risk of extreme monetary injury.

119.   Magleby reasonably relied on the Owner's Construction Drawings in bidding the project and entering into the Subcontract.

120.   Magleby suffered extreme monetary injury where it was forced to bear the substantial expense of added scope of work (design and management of predecessor trades), extended general conditions, labor and materials cost increases, and other overruns resulting from the Owner's inaccurate, unreliable, and uncoordinated Construction Drawings.

121.   Thus, Magleby is entitled to a judgment against Owner, joint and several in nature, in the amount of $14,135,967, or the amount otherwise proven at trial, plus pre- and post-judgment interest at the maximum rate allowed by law.

122.   Plaintiff hereby incorporates by reference the preceding paragraphs hereof as if the same were fully set forth herein.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment – Owner)

123.   Magleby incorporates the preceding paragraphs as though set forth fully herein.

124.   In performing exterior work on the Project, specifically including the added scope of work (design and management of predecessor trades), extended general conditions, labor and materials cost increases, and other overruns resulting

from the inaccurate, unreliable, and uncoordinated Construction Drawings, Magleby conferred a benefit on the Owner.

125.   Based on its inspection and use of the Property, in addition to communications between the Parties, Owner was aware and had knowledge and appreciation of the benefit Magleby conferred.

126.   In profiting from its ownership and operation of the Property, Owner has accepted or retained the benefit Magleby conferred under circumstances that would render it inequitable for Owner to retain the benefit without compensating Magleby for the value of the benefit it conferred.

127.   Magleby is entitled to a judgment against Owner, joint and several in nature, in the amount of $14,135,967, or the amount otherwise proven at trial, plus post-judgment interest at the maximum rate allowed by law.

## THIRDCAUSE OF ACTION
### (Action Against Bond – Sureties and Owner)

128.   Magleby incorporates the preceding paragraphs as though set forth fully herein.

129.   SPHO is the record owner of the Property.

130.   Magleby furnished construction labor, materials, and services in the improvement of the Property pursuant to its Subcontract with Suffolk.

131.   Magleby has not been paid in full for the construction labor, materials,

and services it furnished for the improvement of the Property.

132.   Magleby served SPHO with timely notice of its right to claim a lien in compliance with Montana law.

133.   Magleby timely recorded a construction lien against the Property in compliance with Montana law.

134.    Magleby provided timely notice of its construction lien to SPHO in compliance with Montana law.

135.   On or about August 1, 2022, Owner, through its agent or another and pursuant to MCA § 71-3-551(1), obtained from Sureties a Bond to Release Mechanic's Lien, Bond Nos. 9410800/K41597689/012212761 (the "Bond"), in the amount of $20,736,736.50.

136.   On or about August 3, 2022, the Montana Eighteenth Judicial District Court, Gallatin County entered an Order Approving Bond substituting the Bond as security for Magleby's construction lien and releasing the Property from the lien.

137.   Magleby is entitled to a judgment against Sureties and Owner in an amount equal to any judgment entered against Owner in this action together with any interest, attorney fees, and costs pursuant to MCA §§ 17-3-124 and 71-3-551(3).

## FOURTH CAUSE OF ACTION
### (Negligence – Architect and Design Does)

138.   Magleby incorporates the preceding paragraphs as though set forth

fully herein.

139.   Architect and Design Does had a duty to ensure that the Construction Drawings on the Project were reliable, accurate, and coordinated.

140.   Architect and Design Does breached their duty in providing inaccurate, unreliable and uncoordinated Construction Drawings at the time of bid and commencing construction work on the Project with such drawings.

141.   Architect and Design Does knew or should have foreseen that Magleby and other subcontractors on the Project would rely on the inaccurate, unreliable, and uncoordinated Construction Drawings in submitting bids and entering into subcontracts on the Project at were at risk of injury.

142.   Magleby relied on the Construction Drawings in bidding the project and entering into the Subcontract.

143.   Magleby suffered injury where it was forced to bear the substantial expense of added scope of work (design and management of predecessor trades), extended general conditions, labor and materials cost increases, and other overruns resulting from the inaccurate, unreliable, and uncoordinated Construction Drawings.

144.   Thus, Magleby is entitled to a judgment against Architect and Design Does, joint and severally, in the amount of $14,135,967, or as otherwise proven at

trial, plus pre- post-judgment interest at the maximum rate allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Magleby respectfully requests that the Court enter judgment against the defendants named herein as follows:

1.     On Magleby's First Cause of Action, that the Court enter judgment against Owner and in favor of Magleby in the amount of $14,135,967, or the amount otherwise proven at trial, plus pre- and post-judgment interest at the maximum rate allowed by law.

2.     On Magleby's Second Cause of Action, that the Court enter judgment against Owner and in favor of Magleby in the amount of $14,135,967, or the amount otherwise proven at trial, plus post-judgment interest at the maximum rate allowed by law.

3.     On Magleby's Third Cause of Action, that the Court enter judgment against Sureties and Owner and in favor of Magleby in an amount equal to any judgment entered against Owner in this action together with any interest, attorney fees, and costs pursuant to MCA § 71-3-124.

4.     On Magleby's Fourth Cause of Action, that the Court enter judgment against Architect and Design Does and in favor of Magleby in the amount of $14,135,967, or the amount otherwise proven at trial, plus pre- and post-judgment

interest at the maximum rate allowed by law.

     5.     For all other relief the Court deems just and equitable.

DATED this 1st  day of September, 2022.

WORDEN THANE P.C

By:  */s/ Sean Morris*
           Sean Morris
           *Attorneys for Plaintiff*

28